IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| ISIDORO MARTINEZ | § | |
| v. | § | CIVIL ACTION NO. 6:07cv558 |
| WARDEN PRATT, ET AL. | § | |

<u>MEMORANDUM OPINION AND ORDER OF DISMISSAL</u>

The Plaintiff Isidoro Martinez, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights during his confinement in the prison. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c).

An evidentiary hearing was conducted on March 4, 2008, pursuant to <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985). At this hearing and in his complaint, Martinez says that on September 11, 2007, he went to the infirmary to try to get some followup medical care for his eyes, since he had undergone two cornea transplants. Officer Divin, Lt. Sheets, and Officer Proctor were standing around making noise while Nurse Milton was trying to talk to him. Martinez said that the nurse "became frustrated" because she was trying to listen to what the officers were saying, and so she finally told Lt. Sheets to take him back to his cell. Martinez says that Sheets took him by the arm and pushed him into the wall while threatening to "slam" him. Martinez said that he was not injured but that he could have been.

Martinez complained generally about the medical care he was receiving. He noted that he had undergone the cornea transplants and said that he was not receiving the proper medication, including pain medication and eye drops. He indicated that this was an on-going problem during his time at the Michael Unit.

1

Martinez also complained that a guard named Norman had starved him by depriving him of four meals over a two-day period.  After this, he said, there were no further problems with his meals.

On March 25, 2007, Martinez said that Norman was working that day when he, Martinez, felt someone messing with his eye surgery, and he could see laser lights hitting his face and eyes. He says that the guards have laser lights and when they leave, they give the lights to inmates so that the inmates can "mess with" him by "playing with all parts of my body system."  The next day, a guard gave him some orange juice, and when he drank it, it made his eyes hurt.  Another inmate came from the Skyview Unit and Norman sent to the chaplain to the other inmate's cell and pretended that it was Martinez.  He says that guards were giving him other inmates' food, which was "special medical food," and it could have caused him to suffer side effects.

On April 4, 2007, Martinez says that he wrote to his daughter and others because other inmates were shooting laser lights into his eyes and telling him that an inmate named Dodd, who was at the Wynne Unit, was getting his mail.  Officers and inmates were "cussing him out with the laser lights," and he could feel them hitting the back of his neck.  A week later, on April 10, someone was whispering in his ear with the laser lights, telling him to cut himself so that he could go to the Skyview Unit.  The next day, "they" were talking about an inmate named Detroit, who was going to be hooked up to Martinez's bunk; Martinez says that "they keep playing with my body system when I am lying down" and that he can "feel electricity." The officers would act as though they were going to give him double trays of food but then would not; he says that they would say that he was going to starve, but then they shot lasers into his mouth and stomach and he could not taste the food and did not feel full.

Martinez also had an on-going complaint about his mail, saying that his legal mail was suffering from constant interference.  He did not provide any specific facts or show that he had suffered any tangible legal harm as a result of the alleged interference with his mail. Martinez describes an incident in April of 2007 when he refused to come in from recreation until the problems with his mail and indigent supplies were checked into.  When he finally came in, after being told that

2

the problems would be investigated, he did not get a shower and was given a food loaf, even though he was not supposed to be on food loaf.  Martinez says that that night, guards came and shook his cell door and then shook his neighbor's door, and he heard the officer tell his neighbor that "you was supposed to be on chain," (i.e. getting ready to be transported off the unit), which Martinez says was "like if he was gonna go under my name."  He thought that the officer was "playing a slick game," but he was told that he was on chain, and was taken to the hospital the next day.

Martinez says that he returned from the Estelle Unit on April 20.  He was sent to the physician's assistant, but she said that she did not need to see him.  He was put into a cell but he knew that it was wrong, because other inmates began yelling to a black prisoner named Scarface and making it look as though Scarface was in the cell that Martinez was in.  Martinez says that whenever he was put in a cell, the plastic part of the door would be cracked, and he would be told that it was a "crazy cell," even though Martinez had come from the hospital in Galveston and not the Skyview Unit.  He says that an inmate named Corrilias was put in the cell next to him, but when guards called out Corrilias' name, they made it sound like Martinez.

Next, Martinez complains that he received a disciplinary case for refusing to come in from recreation, even though he was not told that he would get a case.  He says that he was moved to Level III, the lowest level of administrative segregation, even though the case was supposed to be a minor one.  The captain told him to write to Major Cook about it, which he did, but never heard back.  He says that he never got his level back, so he had to wait to get promoted.

On April 29, 2007, Martinez says that the guards had "inmates playing some games," including some inmates who were "hooked up to my bunk."  They kept banging on the walls and blaming Martinez, so that when medical people came by, they would think that Martinez was crazy. He was supposed to get some eye drops on April 19, but he did not get them until May 2, and then he noticed that they were the wrong ones.  Martinez says that every time he wrote grievances, the guards would pull other inmates out of their cells, and when they got back, the guards would ask what the inmates had said about the grievances.  When Saturday and Sunday came, the guards and

3

inmates would "start to play a game and say that Martinez had lost," telling him that "he was jacked" and that someone else had gone to the commissary under his name.  He says that the guards had an inmate they called "San Anto," and when Martinez would write a sick call request, they would call this other inmate out to the medical department.  He then says that some inmates called him "San Anto," because he is from San Antonio, but adds that there was no one called San Anto when he got to the cell block and that "only one inmate called me that way."

Martinez says that guards and inmates would "make spitting noises" in his cell and call him a "reprobate," which he says is "code."  He says that he was writing letters in his cell and guards would come by and talk to other inmates, and would answer Martinez as if he were writing to them. The guards would also shoot laser lights into his cell.  Inmates were whispering, and there was one inmate who would yell when Martinez was trying to read the Bible.  He says that he has heard that Officer Norman stole $100.00 from him but he does not know how, if he does not get any money. Imates and guards were throwing laser lights at him and saying that Officer Norman was the one who was "playing homosexual games with my body system;" Martinez says that every time Norman worked, "I would get my body moved on private parts."

On July 8, 2007, Martinez says that a guard told him about an interview, scheduled for July 16, to see if he would be approved to go to general population.  However, Martinez says that he knew that this was "another slick move" because it was for his neighbor, who was always in his business.  Martinez signed the form for the interview, and the guard went to pull his neighbor out of his cell, but Martinez said "what's up with that?" He says that when he signed the form, the guards shot him in the hand and ears with a laser, and he heard a voice in his ear say "that's for Sgt. Bond."

Martinez was again sent to the hospital in Galveston, and when he came back, he was put in a holding cage in the medical department.  When he was finally taken out, he was put in a different cell, in which the light did not work and the water only came out hot.  Officer Norman was working there and shot lasers at him; Martinez says that the officers "have a habit of speaking to him through

4

the lasers."  On May 6, he was taken to shower and asked for his razor so that he could shave, but the guards brought him a dirty one.  Martinez says that the razor was from Cell 84, but does not say how he knows this.  He did not use it, but the guards didn't notice because "they left so fast."  He wrote to the physician's assistant to ask if the inmate in Cell 84 had any diseases, but she did not answer.

The next day, Martinez says that he felt as though people were messing with his liver by tapping on it.  His eye began to hurt when "they" were shooting laser lights at him.  When he looked out of his cell, he saw captains, majors, lieutenants, sergeants, and wardens standing around the picket.  On May 14, he wrote to the Internal Affairs Department, but received no answer. An inmate was put next to him who had gone out on a furlough under Martinez's name, and on May 29, Martinez says, the guards told him that he was not on the roster, apparently because he had been listed as being on leave since another inmate had gone out under his name. Martinez decided to keep writing to the Classification Department in Huntsville until he got an answer, but he never did.

Martinez says that an inmate was put in the cell next to him who "was going to start playing homosexual games with him."  On May 30, 2007, his neighbor was in communication with an officer named Cynthia Mostic, who was at the Wynne Unit in Huntsville; he says that while he, Martinez, was writing letters to the medical department, he could hear "a female voice" talking to his neighbor and telling the neighbor what to say to Martinez.  The guards and inmates began talking to Martinez about a radio, but he did not know why.

Martinez says that some inmates have square black cameras in their cells, and that female guards visit inmates on every cell block he has been on.  He thinks that these visits concern Martinez's lawsuit, because one particular female guard was the one who helped him when he had "a bubble in his eye."

On June 4, 2007, Martinez wrote to the chaplain and a psychiatrist, but they never came to see him.  He decided to write to federal authorities, but other inmates were whispering that the lieutenant was getting Martinez's mail.  On June 7, guards and inmates were shooting laser lights

into his cell, making "homosexual moaning noises," and accusing him of sexually abusing himself. The next day, he wrote to his family and to Internal Affairs, but he heard other inmates saying that he was writing to them instead. On June 28, he wrote to Internal Affairs again, and received no answer, so he decided to write to two female guards, Linda and Jeannette, as well as to his aunt.

On July 3, 2007, Martinez says that a psychiatrist named Dr. Hill came to see him, saying that a lady named Ms. Echols had told Hill to see him. Hill explained that someone from Martinez's family had called, and also that the PAMIO program (i.e. program for aggressive mentally ill offenders) would not accept him because he was a gang member; however, Martinez says that this is not true because he is not a gang member. He tried to get the psychiatrist to check and see who in his family had called, and the psychiatrist said that he would. Later, Martinez says, he heard two black inmates talking, and one told the other to do what the psychiatrist had told him to do and "play it cool." Martinez says that they wanted him to act like he was the other inmate so that the other inmate could get back his level, and so he decided that they were playing games with him. Later, he heard inmates saying that a lieutenant was "broke" and that one of the staff support inmates was "broke," and says that this "is as if they were playing with my life and gambling against everything I do."

Martinez says that he was told that he had hepatitis C but that he did not need any chronic medications. He says that he thinks that his food is being tampered with, through the addition of bodily fluids or medications from other inmates. He says that sometimes if someone flushes a toilet "he can feel it in his body system." They do this "by hooking up this cell with other people's cells and my body to their bodies with some kind of electrical device." Nurses give other inmates pills and then when the inmates flush the toilet, Martinez says that "he can feel water as if it were in my stomach and sound of toilet." He says that the guards and inmates shoot laser lights at him so that they can say that he is crazy, but he sees them and also the guards can move parts of his body. There are also inmates who are hooked up to his cell to "switch the voices" and make it sound as though they are the ones in there.

On July 5, 2007, Martinez says that he was called out to get some legal papers notarized, and a sergeant came over to see what he was doing, and he could see the laser lights flashing over the paper. When he went back to his cell, he was talking to his neighbor, and he heard someone say that the legal lawsuit was for someone else, a guard named Penada, and that Martinez had "sold his legal work." Another neighbor said that Martinez was dead and that "he had sold himself." He says that inmates were telling him that his legal mail kept coming back because he had escaped.

On July 6, he was taking a nap when some inmates and guards began playing games with him, telling him that he was dying of hepatitis C. He says that the mailroom personnel asked him for a list of addresses to which he was sending mail, but he refused to comply. He tried to mail a letter to a senator, but it came back because it did not have a specific senator's name on it. After discussing more problems with sending out his mail, Martinez says that on July 20, he heard that another inmate went to general population under his name. He says that all of this is happening because of his lawsuits.

On an unspecified day, Martinez says that he spoke to a sergeant about getting some aspirin or Tylenol and the officer promised to bring him some, but did not. He later complained to the sergeant about lying to him. On July 21, Martinez's neighbor was moved, and he received his eye drops that day. He again complains about the disciplinary case in which he was dropped in level even though it was a minor case, and says, without offering any proof, that inmates of other races were getting their classification status back while he was not. He says that "they" keep having inmates whisper that he is suicidal and guards in the picket accuse him of sexual misconduct; they whisper over the intercom and through the lights that they shoot into his cell. Inmates were yelling that Martinez was a snitch, and someone stole his ID card to use to get medical care. He says that "they" were whispering that "Bethea was about to go home," but Bethea was a female guard at another unit, unless she has a relative in prison. He says that "they keep messing with things behind his toilet" and other places like his bunk, so that he can hear computer typing. Martinez states that

he wants polygraph tests administered to the guards and inmates, because he believes that they are the same ones who are playing homosexual games with his stomach, liver, heart, and eyes.

On July 31, 2007, Martinez says that he was put in a holding cage by the medical department to go on a medical chain for his contact lenses.  He saw some officers and complained that he had been unable to get shoes, and that the ones which he had were ripped, but got no response.  When he returned to the Michael Unit, he was put in a different cell, and another inmate went to the office and came back talking about all of the money he was getting in a lawsuit over the medical care. Martinez says that he had sent his own lawsuit to the Eastern District of Texas, but then he got some letters saying that his legal work had been sent to the Southern District.  He then began hearing that guards and inmates had been writing these letters; he wrote letters to the wardens about this, but nothing was done.[1]

On August 14, 2007, Martinez says that the officers were throwing lights on him while he was asleep and making sound as if he were talking.  The officers tell him that he is becoming homosexual, but it is the guards who play homosexual games and hook other people up to his cell. They shoot laser lights at him in order to threaten him, and he cannot get any help in answer to his requests.  On August 16, guards and inmates were playing homosexual games with him while he was asleep, by messing with his body parts and whispering that they were demons and into evil.  He says that "they" keep telling him that he is messing with the guards by filing the lawsuit , and he can "hear someone saying everything I do."  At the end of each month, the guards shoot laser lights at his ears and tell him that he has money in his account, but when he goes to the commissary, he is told that "he is jacked" because someone has stolen it.  He says that he can hear something inside his cell and on the wall like a "moving recording," and the officers give other inmates fake teeth and braces to catch everything that Martinez says.  However, the guards refuse to answer him when he asks if there is some type of computerized program.

---

[1] Martinez did file a lawsuit in the Eastern District of Texas which was transferred to the Southern District.  *See* Martinez v. Earnestin, et al, civil action no. 6:07cv359 (E.D.Tex).

After complaining again that he could not go to the commissary because other people steal his money and that the letters he received had been written by guards and inmates, Martinez says that he was again sent to the hospital in Galveston on August 20.  He says that there was a mix-up concerning his property and then another inmate was sent under his name to the hospital.  He finally got his property back a few days later, but figured that either the officers had used the time to go through it, or the other inmate had taken Martinez's property with him.

Martinez says that several inmates have told him that they can see him, apparently when he is inside his cell.  He says that he was in a cell and heard someone unhooking things from the outside of the cell, some things that were hooked up to his cell and bunk, as well in back of the toilet.  He can also hear a device when he moves around.

Martinez next discusses the September 11, 2007 incident in the infirmary.  He says that the P.A. (actually Nurse Milton) covered his good eye and asked if he could see, and he said no.  He saw that he was carrying "a load of attitude," and she asked him "how do you eat," which Martinez describes as a "nonsensical question."  He replied "with my hands and mouth."  She then got made and said "don't give me no bad remarks, or I'll send you to your cell."  Martinez said that he was not doing that, but Officer Proctor told him not to give the nurse any bad remarks.  When Milton heard that, she told the officers to take Martinez back to his cell.  As he left, Officer Divin asked him "how the f*** do you eat?" Proctor told Martinez that he was going to give him two cases, and Lt. Sheets grabbed his arm "real light."  Martinez told him not to grab him and Sheets told him to shut up. Sheets escorted him a short ways and then pushed him into a wall and said "when I tell you to shut up, you shut up."

On October 18, 2007, Martinez says that he was taken to the medical department, where the physician's assistant told him that she had given him eye drops, eye glasses, contact lenses, and what more did he want? Martinez replied that he had not received his eye drops or his pain medication. A guard came by and began complaining about how inmates get contact lenses and "we have to pay for them too," and Martinez remarked that his family pays taxes too.  The P.A. said "no they don't"

and told the guard to "get him out of here."  Martinez says that there was confusion on the cellblock about who was supposed to go to the medical department, and when the inmate in 11 cell go back from the medical department, he began to hook something up to listen to everything that Martinez was writing, telling Martinez "whispering unnecessary words" and flushing his toilet.  Another guard was walking around the cell block and began to shoot lights into Martinez's eyes.

Martinez says that guards and inmates go to the commissary with a "computer radio" of his and purchase items with it.  He also says that they use him to communicate with others, because he can sense someone telling him that he has a magazine or asking if he wants a bag of coffee.  Someone else then answers and makes it sound as though Martinez is speaking.

Martinez also says that sometimes he feels as though "they" switch his eyes by flipping them, and then whisper "I see you."  The laser lights make recordings of his eyes as he writes, and shoot at the walls and bunk in his cell.  He can also hear voices talking through his toilet, as though the toilet is hooked up somewhere else.  He finishes by saying "there's plenty more of this."

Martinez's Medical Records

The Court has received and reviewed copies of these medical records.  According to the records, Martinez has been diagnosed with "delusional disorder, schizophrenia, paranoid type." The records indicate that he has had two corneal transplants, of which the left was not successful.  Martinez suffers from an ailment called keratoconus, which is a thinning disorder of the cornea which causes distortion and reduced vision.  *See* http://www.nkcf.org.

Martinez has been prescribed eye drops on numerous occasions.  At one point, on September 15, 2007, it was noted that he had some drainage coming out of his eye, and the computer records showed that he did have drops ordered but the order had expired.  He was laid in to see a provider and reminded that it is his responsibility to put in a sick call request to have his medication renewed before it expires.  He saw Dr. Susan Morris on September 17, and she noted that he had an upcoming appointment with the ophthalmology department at the hospital in Galveston; she also renewed his prescription for eye drops.  The medical records show that Martinez has had a number of

appointments to the hospital in Galveston, as well as stays at the Skyview Unit, a psychiatric facility. He has also received both prescription glasses and contact lenses.  According to a grievance dated in February of 2008, Martinez's eye drops were ultimately discontinued by a doctor in Galveston.

Martinez's medical records do not show that he ever suffered any injury as a result of his shoes, nor that he ever complained to medical personnel about such an injury.  He did file one grievance about his shoes on August 14, and the response was that he had received new shoes on August 17 and so his grievance was resolved.

### Legal Standards and Analysis

In Neitzke v. Williams, 490 U.S. 319, 325 (1989), the Supreme Court held that "a complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or in fact."  The Court went on to say that a claim is legally frivolous under Section 1915(d) when it is based on "an indisputably meritless legal theory."  Neitzke, 490 U.S. at 327.  The Fifth Circuit has noted that a finding of factual frivolousness is appropriate where the facts alleged rise to the level of the irrational or wholly incredible.  Ancar v. Sara Plasma, Inc., 964 F.2d 465, 468 (5th Cir. 1992).

In this case, it is apparent that Martinez's claims that he is being shot by lasers, that guards communicate with him through lasers in his ears, that his cell is hooked up to others, that his body parts are being manipulated at long range, that his food is being tampered with, and that guards and inmates are stealing his identity, are irrational and wholly incredible.  See Williams v. Collins, slip op. no. 92-4921 (5th Cir., March 18, 1993) (unpublished) (affirming dismissal, as factually frivolous, of complaint that prison officials were pumping toxic gas into an inmate's cell).  Accord, Gordon v. Secretary of State of New Jersey, 460 F.Supp. 1026 (D.C.N.J. 1978) (prisoner denied the office of President of the United States because of his illegal incarceration in jail); Searight v. State of New Jersey, 412 F.Supp. 413 (D.C.N.J. 1976) (prisoner alleged that the defendants unlawfully injected him with a radium beam, so someone talks to him inside of his brain).

Martinez also raises claims which do not fall within the realm of factual frivolousness, but are nonetheless without merit.  He says that he has been denied medical care, but a review of his medical records belies this contention.  The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not.  <u>Norton v. Dimazana</u>, 122 F.3d 286, 291 (5th Cir. 1997); <u>Jackson v. Cain</u>, 864 F.2d 1235, 1246 (5th Cir. 1989).  However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation.  <u>Johnson v. Treen</u>, 759 F.2d 1236, 1238 (5th Cir. 1985); <u>Norton</u>, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim.  <u>Varnado v. Collins</u>, 920 F.2d 320, 321 (5th Cir. 1991).  Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action.  <u>Graves v. Hampton</u>, 1 F.3d 315, 319-20 (5th Cir. 1993).  The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs.  <u>Mayweather v. Foti</u>, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs.  <u>Spears v. McCotter</u>, 766 F.2d 179, 181 (5th Cir. 1985).  It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs.  <u>Banuelos v. McFarland</u>, 41 F.3d 232, 235 (5th Cir. 1995).

In <u>Domino v. TDCJ-ID</u>, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later.  The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet.  It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.  Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985).  Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  Id.  Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97, 107 (1972).  And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference.  Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756; see also Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

In this case, Martinez has not met the "extremely high" standard for deliberate indifference to his serious medical needs.  He has received corneal transplants and has had numerous appointments for followup care, and was prescribed eye drops on a regular basis until these were discontinued by a physician in Galveston.  Even if Martinez did not always get his eye drops or pain medication, as he says, he has not shown that this was the result of deliberate indifference to his serious medical needs.  Martinez's claim on this point is without merit.

Similarly, Martinez has not shown that the problem which he had with his shoes was one of constitutional dimensions.  As noted above, the medical records do not show that he suffered any injury from wearing tattered shoes, nor did he file any sick call requests complaining of such an injury.  When he filed a grievance, the response was that he had received new shoes a few days after complaining about the situation.

The Fifth Circuit has held that inmates are entitled to receive reasonably adequate clothing.  Green v. McKaskle, 788 F.2d 1116, 1125 (5th Cir. 1986).  In this case, Martinez indicates that his shoes reached a point where they were not "reasonably adequate," but when he complained about them, they were replaced. Even if the receipt of the replacement pair took longer than it should have, or if his need for shoes was negligently overlooked, Martinez has still failed to show that he was the victim of deliberate indifference to his need for reasonably adequate clothing.  His claim on this point is without merit.

Martinez complained that his legal mail was being interfered with.  The Fifth Circuit has stated that inmates complaining of tampering with legal mail must show that his legal position has been prejudiced by the mail tampering.  Walker v. Navarro County Jail, 4 F.3d 410, 413 (5th Cir. 1993), *citing* Henthorn v. Swinson, 955 F.2d 351, 354 (5th Cir.), *cert. denied* 112 U.S. 2974 (1992). Martinez has not shown any harm to his legal position.  Court records show that Martinez has filed three civil rights lawsuits in the Texas federal courts, including the present one, and numerous motions in each of these cases. *See* Martinez v. Earnestin, civil action no. 4:07cv2765 (S.D.Tex.); Martinez v. Nuelon, civil action no. 4:07cv3015 (S.D.Tex.).  The mere fact of legal mail being opened outside of his presence, as he appears to allege, does not by itself state a constitutional claim. Brewer v. Wilkinson, 3 F.3d 816, 818 (5th Cir. 1993).  This claim is without merit.

Martinez further complains of an incident which took place on September 11, 2007.  He says that he was in the infirmary seeing Nurse Milton when some other officers were talking loudly nearby.  This frustrated the nurse and so she told the officers to return Martinez to his cell, and a use of force ensued.

Although Martinez asserts that the officers interfered with his receipt of medical care, this claim is patently without merit.  Interference with medical assistance by security officers may state a valid claim if the interference amounts to deliberate indifference to a serious medical need.  Estelle v. Gamble, 429 U.S. 97, 105 (1976).  Martinez has not shown that the fact that the officers were talking amounted to deliberate indifference to his medical needs.  In his pleadings, he indicates that when Milton asked him how he ate, he replied "with my hands and mouth," an answer which was obviously not what the nurse was looking for, and that it was his giving of this facetious answer, rather than the fact of the guards talking, which prompted Milton to ask that Martinez be returned to his cell.

Martinez also complains that Lt. Sheets pushed him into the wall, but acknowledged that he had not been injured.  In Jackson v. Culbertson, 984 F.2d 699 (5th Cir. 1993), the plaintiff complained that guards sprayed a fire hose into his cell, but he suffered no injuries, and so the Fifth

14

Circuit held that he had no constitutional claim.  *See also* Siglar v. Hightower, 112 F.3d 191 (5th Cir. 1997) (sore, bruised ear which lasted for three days and did not require medical attention was held to be *de minimis*, so there was no constitutional claim).  Because Martinez acknowledged that he suffered no injuries, his claim regarding the alleged use of force is without merit.

Martinez testified at the Spears hearing that Officer Norman had deprived him of four meals over a two-day period.  The deprivation of four meals does not amount to a deprivation of "the minimal measures of life's necessities." Talib v. Gilley, 138 F.3d 211, 214 (5th Cir. 1998); *see also* Moss v. Ward, 450 F.Supp. 591, 596 (W.D.N.Y. 1978).  While Martinez claims that his meals were tampered with, as noted above, he offers nothing to substantiate this conclusory allegation, nor do his medical records reflect any ill effects from the alleged tampering.  His claims concerning his meals are without merit.

Martinez refers to a disciplinary case which he received, in which he says that he was lowered in classification status even though the case was minor.  He says that the case was for not coming in from recreation, but TDCJ records do not show that Martinez received a disciplinary case for such an offense.  He did get a case in April of 2007, but this case was for refusing an order to submit to hand restraints, and was not graded as minor.

Even assuming the accuracy of Martinez's contention, he has failed to show a constitutional violation.  The Supreme Court has held that the States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, but these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. Sandin v. Conner, 115 S.Ct. 2293, 2301 (1995).  A reduction in classification status does not give rise to protection by the Due Process Clause of its own force, nor does it impose an atypical or significant hardship in relation to the ordinary incidents of prison life.  *See* Pichardo v. Kinker, 73 F.3d 612, 613 (5th Cir. 1996);   Wilson v. Budney, 976 F.2d 957, 958 (5th Cir. 1992) (no

constitutionally protected liberty interest in classification status).  Because Martinez has not shown the deprivation of a constitutionally protected liberty interest, his claim concerning the disciplinary case is without merit.

Finally, Martinez makes allusions to retaliation, indicating that the alleged abuses he is suffering are because of the lawsuits which he has filed.  The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred.  Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997).  This requirement places a heavy burden upon inmates, because mere conclusionary allegations will not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred.  Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation.  Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995).

In this case, Martinez has wholly failed to set out a cognizable claim of retaliation.  The retaliatory adverse actions which he cites involve laser attacks and persons being hooked up to his bunk, and his claims in this regard are factually frivolous.  In addition, Martinez has produced neither direct evidence of retaliation nor a chronology of events from which retaliation may plausibly be inferred.  Instead, he has offered nothing more than a personal belief that he has been the victim of retaliation.  To the extent that Martinez raised a retaliation claim in his pleadings, this contention is without merit.

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any

16

portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke v. Williams, 490 at 327, *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995). As noted above, a finding of factual frivolousness is appropriate where the facts are "clearly baseless," a category encompassing allegations which are "fanciful, fantastic, and delusional." Hicks v. Garner, 69 F.3d 22, 25 (5th Cir. 1995).

In this case, a number of Martinez's allegations, as set forth above, are fanciful, fantastic, and delusional, and may be dismissed as factually frivolous. A review of those claims which are not factually frivolous demonstrates that these claims lack any arguable basis in law. Consequently, his lawsuit may be dismissed as legally and factually frivolous under 28 U.S.C. §1915A(b). *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous. 28 U.S.C. §1915A(b). It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **23** day of **March, 2008.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE